Good afternoon, Your Honor. Michael Gordon, may it please the Court. I represent Mr. Henry Saunders, judge, as a preliminary matter in the courtroom are some of his family members, and these briefs were filed under seal. The government has no opposition to them remaining in the courtroom. They were filed under seal because the victim at the time the offense occurred, but not at the time she testified, was a minor. So that's a preliminary matter. So these briefs in front of us are under seal? Yes, sir. Oh, there's no indication on the brief itself. Okay. I filed a motion to seal it after I thought about it, in fact, when I filed the opening brief, and then all briefs subsequently are filed under seal. May I continue? Please. The question and the daunting question before the jury that had to be answered ultimately is why would a young girl, 18 years old, 8 years after molestations purportedly occurred, come forward and suggest and accuse her uncle of committing those molestations? The government knew it had a daunting task when it came forward. It presented testimony from an expert witness about the late reporting syndrome. It presented testimony, obviously, from the victim. It presented testimony from the boyfriend. But what we're dealing with here is the appellant's inability to bring forward evidence of what I've dubbed a false allegation motion, and that is probably inarticulately stated in the briefs. What I'm talking about is an allegation that the victim in this case, at the same time she was making allegations that the appellant in this case had molested her, that someone else had molested her before. And it was our theory, or it was the theory below, that she was looking for a plausible sexual villain to explain why she had a sexual past and why to her boyfriend she was infertile. Did we have an office proof on this? How exactly did it come in? Because it was excluded, right? Yes, it was excluded. So the thing we're talking about is hard to sort of... It's hard to put your arms around. I agree with that. And I'm sort of wondering where it's described in the record, what it is that the defense hoped to elicit or what they had proof of putting in. Well, the... It was something about a charge against her brothers. I'm sorry? It was something about a charge of molestation. Oh, yeah. There were three charged molestations in this case. No, no. I don't mean against your client. Right. I'm talking about the other... Yeah, it was... That's... I'm trying to... Right. And that was the subject of a motion, a written motion filed under seal by the appellant, that Brandy, at the time she was making allegations against her uncle, had also made an allegation that she had been raped by two other individuals. And then the proper testimony was to be that, A, the rape never occurred, but, B, a week later she submitted a written apology note to the sister of the two brothers that she was accusing and that it never actually occurred. Yeah. And when did that charge that she apparently made and then retracted by letter take place? Okay. It depends on when you're asking when did the... 1998 or 1999 is the evidence. Well, I'm reading from page 569, 570, Bates Stamp, in Excerpts of Record, Volume 2. Right. Jolene Taylor would testify, da-da-da-da-da, during the school year of 97 to 98, and this incident occurred in January or February of 98 when Jolene and Brandy, Brenda were both attending church there in the back of the church Jolene talked to. So it sounds as though the report to the sister of the rape by the brothers takes place in January or February of 98. It sounds, I think, later on in that same volume, Judge, there's reference to 1998 and 99. I may be mistaken about that. I think I wrote down page 564. But the offer of proof sounds as though it's for 98. And if you've got me a later date, that might be useful. On page 568, Mr. Glanzer, who's the defense counsel in this case, is putting forth his argument as to why the evidence would be admissible, and he says, And those were the allegations made to Jolene Taylor. Ramzan and Dion, who are the brothers, would both take the stand and say they never had any such relations with Jolene, that they didn't associate with her and they weren't. I missed what I was going to say. The reason I'm asking this, just so you sort of have everything out on the table, so you're approaching it with that in mind, is that if the charge to the brothers raped her was made in the early 98, January or February of 98, and if she didn't begin dating the boyfriend until about a year later. Right. That suggests to me that the charge was not made as part of her effort to convince her boyfriend as to why she was infertile. Right. And I'm sorry. I was misreading. I was reading too late in the transcript. It's on page 567. Okay. Where Mr. Glanzer says the issue, it would go to the issue, first of all, of credibility, because the allegations that were made. I'm on 567, but slow down a little bit. Point it towards your mouse. Oh, I'm sorry. Point it towards you. There we go. And I'll make an attempt to speak more slowly as well. Starting on line 10 of that transcript, it says the issue, it would go to the issue, first of all, of credibility. First of all, certainly of credibility, because the allegations that were made concerning Dion Taylor and Ramden Taylor were made during the same time period of time that she brought forth the allegations against Ramson and Dion. And as I said. That sentence is an identity function, meaning she made the statements about Ramson and Dion at the same time. She made the statements about Ramson and Dion. Yeah. Okay. Well, I think what he was trying to say that he was making, he was making, rather, she was making the allegations at the same time she was making allegations in 1998 and 1999. You look at the top of page 567. No, that's the judge speaking. I take that back. I'd have to take a look, Your Honor, at the motion that was filed under seal that I did not provide. Perhaps the only thing I didn't provide in the excerpt of record was a sealed motion where he does say that the allegations were being made at the same time that the allegations were being made against the uncle. The allegations against Mr. Saunders were being made. Right. What do we know at the specific time, or we must know, when were the allegations first made against Mr. Saunders? 1999 is my recollection. Right. But this is fairly specific here, the testimony I just read to you, or rather, the offer of proof I just made to you stating January or February 98. Can you point that out to me again on page 570? It's 569 and 70 beginning at the very bottom, line 25 of 569 and running over to the top of 570. This is Mr. Glanzer making his offer of proof during the school year of 97 to 98, and this incident occurred in January or February 98, da, da, da, da, da. Right. I see that in there. It sounds like it's a year before she has – she's trying to make these explanations to her boyfriend. It does that, Judge. And I don't – I can't explain that because in the record it seemed to me that Mr. Glanzer – Does it refer to the disclosure or the actual claimed molestation? This is the disclosure and the disclaimed. It happened – they were two weeks apart, actually. In terms of this alleged rape by the two Taylor brothers. That's correct. But when did she claim that the rape had occurred? About two weeks prior to the disclosure. Two weeks. Okay. So it was – I think it was a week between the disclosure and the apology note, or it's a week or two. I don't remember exactly, but it's about the same time. To get into evidence that she said this before, it turns out she retracts it later. You want to conclude from the retraction that the initial charge was a lie. Right. And you're trying to connect it up and saying, you know, she had a pattern of making sexual abuse charges because that was her explanation to her boyfriend as to why she's infertile. That's why she charged against the Taylor brothers. That's why she charges against Mr. Saunders. That's correct. And I would – But if she makes the charge against the Taylor brothers a year before she's beginning to date the boyfriend and making the explanation and making the charge before – about Mr. Saunders, we've got a timing problem. Judge, I would concede to that that we have a timing problem. What I would ask the court for leave to do is submit that sealed document to see what was actually proffered in writing to the court and whether the defense lawyer at that point had misspoken, because my recollection of it was it was at the same time. If I'm wrong, I don't have it with me. And that's the problem with a case like this. I'm going to go forward with the argument on the supposition now, knowing the law under Hughes and knowing the law, that you have to really connect it up with the defense theory of the case that it was at the same time period, because it would seem to me that if you exclude that type of evidence, this court is being put in a position where it has to remind the government 10 years or so, Crosby being the last time it reminded the government, that when evidence is calculated to cause a jury to doubt or have reason to doubt, then it's not for the judge to speculate as to the veracity of those statements, and it's to give the defendant every opportunity to produce doubt in the trier of fact. And 10 years ago in Crosby, this Court, I think Judge Kaczynski authored the opinion, held that when such evidence is excluded, then such evidence is subject to the harmless error rule, and in close cases, like I submit this case is a close case, then the conviction ought to be reversed. Why is this a close case when we even have confession? Pardon me? Even if this were error, I'm not sure that it is, but for the purpose of the question there's a lot of evidence, including Mr. Saunders' own confession. There is a lot of evidence on the confession, and there's a lot of evidence trying to explain away the confession as well. And again, the confession arose out of circumstances where the defendant in this case, the appellant in this case, claimed not to understand English as well as the investigator thought he understood English. That's only one confession. You have a second one to the family. You have a family confession as well. So we have two separate times in which people have heard him say, admit that he did it. Well, he didn't really quite come that far. If you remember the cross-examination of the defendant in that case, or rather of the people who heard what was going on, it was the devil made me do it, and then when the defendant would make such a statement at the forgiveness ceremony, he was saying that at a time frame closer to the time in question, we don't know whether it was before or after she was 18, Brandy had done something to initiate sexual contact, and he had been feeling guilty about it, and she had taken his hand and put it inside her clothing. Someone or something interrupted that, and then he pulled his hand away, and she went outside the door. Now, it was that event, I would submit to you, that the jury could have inferred, along with this evidence if it had it before it, that he was not confessing to any offense that occurred in 1993, but was feeling guilty about having had some sort of sexual contact, if you will, with his niece during the more recent time period. Did I answer your question? I think so. So the defendant didn't testify in this case, did he? No, yes, he did. He did testify. Yes. And is that his explanation for the forgiveness ceremony? Yes. Well, he testifies not directly to that being the explanation for the forgiveness ceremony, but he testifies to an incident that occurred around the forgiveness ceremony, or during that time period. But was he questioned about the forgiveness ceremony? I think on cross-examination he was questioned about the forgiveness ceremony. He didn't deny any of the testimony concerning what people heard him testify that they heard him say. He didn't controvert what others said he said at the forgiveness ceremony, did they? No. To the extent, I mean, to the extent the inference they were drawing is there was some controversy over how to translate sexual intercourse into Navajo, and a whole issue. And to the extent he was being cross-examined on it, he never admitted it. He never admitted to anyone on cross-examination that he either said during the forgiveness ceremony or at any other time, including his statements to Investigator Joe, that he had been involved or had sexual intercourse with the victim in this case, Brandy. Did Investigator Joe interview him in Navajo or in English? Both. Both. He interviewed him in both. And there's also testimony that the defendant obviously is hard of hearing, which goes to some sentencing issues later on down the road. But there was conflicting testimony about the defendant's proficiency in English. Some testified that they believed he could speak English very well. Some testified that they didn't think he could speak English very well at all. And what was the testimony, if any, about Investigator Joe's proficiency in Navajo? It was good. His testimony that his proficiency was good, and I think they understood one another in Navajo. The statement, however, was written in English. And then there was testimony that the defendant testified that Investigator Joe actually wrote out the statement, and he just signed it in English. The conversation took place outside, away from the house, outdoors where he couldn't hear. To set aside the confession, the jury would have had to believe that the investigator made up the story. You know, he had this conversation with him in Navajo and partly in English, and then he wrote down a story that was quite different from what they discussed, and your client signed it thinking it was the real story. No, I don't think so. I don't think you have to go that far. I don't think you have to say that he made up the story. I think as law enforcement can and do do from time to time, they become a bit zealous in their reporting of what they heard or believe the defendant had said to them. In this case, he was dealing with a man who was hard of hearing. He was dealing with him in two languages. Well, but there's a big difference between saying I had sexual relations with an 11-year-old girl and saying I did nothing of the sort. I mean, they're not close. Oh, I agree. I'm having trouble reconciling the thing except by the theory that the agent fabricated the story. Yeah, I don't think that was the theory at all, or was it proffered below? I mean, what could the jury – what should the jury have made, you know, if it had bought the defendant's view of that confession? You talked about the family confession. Same thing, Judge, that when speaking about the events that occurred between Brandy Bilene and the defendant in this case, there was apparently, according to the defendant's testimony, some initiation of sexual contact between the defendant and Brandy. And that's what gave rise to the guilt. Now, when Investigator Joe goes out and speaks with the defendant about having ever had sexual contact, and apparently sexual intercourse from the record is a very difficult term to translate in Avaho, and you could see that if you referred back to Gary Tom's testimony. In any event, you could see that an investigator who was being zealous, even perhaps overzealous about what he was hearing in English and in Navajo from a man who could not hear what he was saying could write out a statement, and the defendant could, from a jury's perspective, just sign it to get him out of there. But was Mr. Saunders' defense at trial that this simply didn't happen, that there was no sexual contact? Yes. Yes. The 1993 contact did not happen. So, in other words, the difficulty of translating in any precise way the term sexual intercourse really is not going to get at the contradiction between any version of this confession and his statement, it didn't happen. This is, I'm afraid, we're back to Judge Kaczynski's hypothetical, where Agent Joe pretty much had to make it up. No. No, I don't think so. Let me try to explain it a different way. We have the first reporting of the incident occurring in 1999 or 98, depending on whether I'm wrong about that sealed document or not. And then we have Brandy going out to law enforcement. And finally, law enforcement coming to Brandy. And we know that law enforcement came to Brandy. Law enforcement coming to the defendant, I apologize, after the forgiveness ceremony. So we have this forgiveness ceremony going on, and then law enforcement coming out and talking to the defendant. And my recollection, I don't have an exact date of when that statement was made, but that statement was made certainly after the forgiveness ceremony. And he is being interrogated about having sexual contact with his niece. Now, his niece is – And so your argument is that Agent – that Officer Joe got the dates wrong. Right. Right. And it's not only just the dates wrong, but sort of in the whole confluence of events, what he's talking about is what he thinks is sexual intercourse. Right. But not – but that – but your argument is that got the dates wrong takes care – is your way of responding to Judge Kaczynski when Judge Kaczynski says we had to make it up out of whole cloth. You're saying he got the date wrong. Officer Joe was talking about 1993. Mr. Saunders was talking about 1998 or 1999. And further, then we have the translation difficulties. That's correct. And hearing difficulties. I understand your position. Okay. Okay. Our position then is whether he was constitutionally entitled to get that evidence in. I think if I'm right about the dates, and now I'm weary of my saying that so unequivocally, I think I am right about the dates, then he is entitled to reversal on that issue. The whole second issue – I see I'm out of time. Do you want me to continue with the 404B question? Take a minute. The 404B issue dealt with the district courts allowing the defendant – rather, allowing the victim to testify about there being many events and using the inextricably intertwined exception to the 404B analysis to get that kind of evidence in. There were three alleged – There was an in limine ruling that it couldn't be done, and then the judge – Judge, I have to say that – I was a little confused about that. There was an in limine ruling, and the in limine ruling was a strange ruling. It first said that it couldn't be done, not until I say otherwise. And then the government proceeded to argue why she should be able to refer to other events, and then the defense objected, and then the court came back and said, I'm not going to give any more analysis on this, and I'll do this by a question-by-question basis. Then I provided all of Brandy's testimony here intentionally because I think both parties – and I give credit to the government on this, too – the prosecutor was very careful to refer to the first event as the February event, the second event as the March event, and the third event as the June event, even though when she first reported it to law enforcement, she had confused events, or she purportedly had confused events, depending on what you were looking at. On cross-examination, the defense counsel was equally fastidious in referring to the events in question and the events in the statements, and did not go out of that – those timeframes or those three time periods. The prosecutor, however, misheard, misunderstood, became incensed. I don't know how you look at it. She immediately gets up and starts cross-examining, or it's really a cross-examination. They're leading questions, but they weren't objected to with the victim in this case, and starts asking her about were there other events. Did you, for example, have other events in your mind when you were talking to Officer Dodge the first time was one of the questions she asked. More than one, more than two, more than three. Objection. Overruled. I mean, those were the kind of things that were going on. Finally, the judge takes a sidebar. The prosecutor argues that the defense opened the door by suggesting somehow that Brandy had hidden these other two events from law enforcement. Judge, there were three events that were alleged in the indictment. When she first came forward, she said it happened in June. That was in July of 2001. She said it happened in June. Then in November of 2001, she said it happened in June. And it was only in April of 2002 that she say it happened earlier. So it seems to me that he had every right to take those three different statements, direct his attention to those statements, extract what she told law enforcement, without risking opening the door to there being many questions. Thank you. We'll hear from the government now. May it please the Court. Linda Boone on behalf of the United States. Good afternoon. In that the government did not have an opportunity to respond to the reply brief from opposing counsel, there are two important points that I would like to raise in response to the defendant's argument on sentencing enhancements. First of all is that the findings of fact can be inferred from the jury's verdict and, secondly, that the defense counsel and, therefore, defendant conceded the relevant underlying facts which were in support of the enhancements at sentencing. Specifically, the district court's finding of care, custody, and control went to count two. And if the court would refer to SDR 36 to 38, counsel conceded that the facts found were that the victim, the victim was alone with the defendant. The only thing that counsel challenged was whether or not the custody was required to be given. No, I'm sorry. You asked me too fast for those pages. I'm sorry. SDR 36 to 38, the court is at sentencing and discussing the enhancement for care, custody, and control. And at that point, defense counsel makes it clear that his challenge is not to the underlying facts of whether or not the victim was alone with the defendant in his truck being transported back and forth from a church revival, but whether or not the custody had to be given to the defendant for this enhancement. I can't find the language that you think is relevant. Can you direct me to it? Yes, sir. Thank you. Oh, I'm an ER. I'm not an SDR. Oh, I'm sorry. It was in the SDR. No, you said it right. I just misheard you. At the beginning of the page near line 10, this is defense counsel speaking. And so they were together. They were the only two together. And so they were the only two together. She was a minor at the time, apparently, according to the testimony. And so that's the factual situation. But whether the care, custody, and control was given to Mr. Saunders in that situation, I don't have that information, because it is possible some teenagers are allowed to go there, go here and there on their own without supervision and control. And so you're saying that this is enough to be a concession, that he did have care, custody, and control for the purpose of the sentencing enhancement? For clarification, Your Honor, the government is saying that the underlying facts of whether or not the victim was alone with the defendant in the truck and no one else is conceded, that's not contested. He only challenged whether or not the custody had to be given to the defendant in order for that enhancement to apply. And the district court found that that was not required for the enhancement. Merely the fact that she was within his control was sufficient for the enhancement to apply. He wasn't being alone with somebody and being within somebody's control. That is absolutely correct, Your Honor. And the facts in this case were that she was in this defendant's control because he was driving her back and forth between her home and the church revival alone with no one else. When I hear those words care, custody, and control, I think of something that is volitional where somebody responsible has said, I've got to stay here after church. Would you mind taking my daughter home and running her home? That would be care, custody, and control. Now, she's out on frolic and detour. But she's not, Your Honor. That the facts in this case was clear. The testimony was that the victim wanted to go to the church revival. The defendant was going to the church revival. The mother of the victim asked her mother if she could go with her uncle. I'm not sure what you're saying here. You know, there may have been facts about this, but the jury wasn't asked to find any of this stuff. Oh, Your Honor, the jury found in that the jury convicted the defendant of count two, which are specifically the facts surrounding this specific incident. What are the elements of count two that would go to care, custody, and control? The testimony was that this – Not the testimony. What's the element? What's the element of the charge that the jury necessarily had to find in order to convict Mr. Saunders of count two? That the victim was alone and was physically – Is that what the charge says, that he was alone with her? What does the charge say? What was the crime that was charged that the jury found him guilty of? Aggravated sexual abuse of a minor under the age of 12, Your Honor. Okay, but it wasn't aggravated sexual abuse of a minor under the age of 12 in his care, custody, and control. No, Your Honor, those would not be charged. That would not require him to have been alone. He could have done it in public. He could have done it in public, Your Honor. However, if the jury convicted the defendant of this count, and there was no testimony at all from which it could have found it was in public, then that would be an – There was no reason to present evidence one way or the other. But the evidence was presented, Your Honor, that they were alone. The government presented evidence, but the defense didn't. Since this wasn't a charge, since this wasn't an element of the crime, why would the defense bother to present evidence at this point? Your Honor, the defense did not present evidence in this fact. The defense – Why would it? Let's say there was somebody else in the car. In that view, that would make a difference. Why would they present that evidence? What difference would it make to the thing the defendant was charged with? There was no conflicting evidence regarding that. Because that wasn't the thing that was being tried. You tried the things that are presented to the jury. You now want to try this other thing that wasn't presented to the jury. You want to say the jury must have found this. Well, yes, Your Honor, in this case, because there was specific evidence that a – You're wasting your time. I'm sorry, Your Honor? You're wasting your time. Well – And that was – I think it's time to move on to another issue. Fine, Your Honor. I would also like to discuss the downward departures in this case, because this Court in United States v. Anders, in clarifying Cook, specifically said that the Court may evaluate a complex of factors as set out in Cook, but the factors must be at least authorized under the sentencing guidelines and certainly not expressly prohibited by the sentencing guidelines. Here, the district court did not even set out any findings of fact to demonstrate why the factors – Couldn't Coon basically say the district judge has wide discretion and we ought not to mess with it on appeal? Coon? I know Coon. Yes, absolutely, Your Honor. However, under the holding in Anders, it's very clear. You – the Court can depart, but the Court must depart under a basis that is authorized or not expressly prohibited. In this particular case, it appears clearly from the Court's own language that it primarily relied upon this defendant's sex and this defendant's race or national origin. And the defendant is a pastor. It relied upon other things, Your Honor, like age, but it made no finding concerning infirmity. And certainly, 59 is not extraordinarily old. We like to believe that. And the closer I get to it, the less old I feel it is also, Your Honor. But the Court made no findings that there was anything extraordinary, none whatsoever. Does the Court have to find there's something extraordinary? Yes, it does, Your Honor. Anders and Cook specifically say that. And the defense, the opposing counsel has misstated – Remember what happened in Kuhn. In Kuhn, these were the officers involved in the Kuhn case. And the Supreme Court said, look, the police officers, they would naturally suffer more because they're going to prison than with somebody who wasn't involved in law enforcement, and therefore, I'm going to give a downward departure. We reversed, and the Supreme Court reversed us. Yes, Your Honor. saying their status as police officers was good enough, and the district court had discretion. Why wouldn't the fact that the district court here said this guy's a pastor, and so his father, you know, the embarrassment, the, you know, public disapproval that goes with it falls particularly hard on a man of the cloth, and therefore, he's been punished some more than a regular person would. So I'm going to fall down with three levels. What's wrong with that? How is that different from Kuhn? Your Honor, it is not necessarily different from Kuhn, but it ignores Cook. And Cook is what the district court said it relied on to base its departures on a complex of factors, and that is the problem with its holding here. Good works are expected of a minister, and the court itself said that no matter how good the works the defendant did, it could not excuse the nature of the horrific and particularly despicable crime. Those are the words of the district court itself. The imposition of this. It sounds to me like this district judge was not unmindful of the seriousness of the crime. That is correct, Your Honor. That would support him when he decides to defraud. That would tell us that he has exercised some reason. This is not somebody who's making light of the crime or saying, oh, it's no big deal. It's just a rape of a minor. This is really a horrific crime. But, you know, this guy's been, you know, old. His wife is sick. He's so old. His wife's so old and sick, and he's a pastor. You know, he's suffered enough. He suffered some, in addition to the normal situation, and some of the part down a little bit. He didn't depart down very much, right? Three points? Three levels, Your Honor. It was quite a difference. His original. What was the sensing range? What would the sensing range have been without? Without it, it was 188 months to 235 months, Your Honor. Without the enhancement, it would have brought it down to 151 to 188 months. And the district court brought it down to 135 to 168 months and sentenced him at the very bottom. So that was a substantial difference. About 50 months. Substantial difference, Your Honor. Four years. Four years, right? And the sentence actually imposed is 135 months. 135, the very bottom of the lower departure, Your Honor. A little bit over 11 years and in lieu of 15 years. Your Honor, the government's primary argument here is not that the district court could not exercise discretion, but that the district court exercised it improperly in this case using factors which are precluded by the ---- And tell me again what are the precluded factors? The precluded factors were age, because there was no finding or showing or claim of infirmity by the defendant, race and national origin. Those are ---- Tell me what your basis is for concluding that the district judge relied on race and or national origin. Certainly, Your Honor, because the district court said in sentencing, defense counsel had argued that the life expectancy for a male, Navajo, was 67, approximately 67 years. Yes. And so, therefore, if the district court gave this defendant anything more than about 8 years, it was potentially a life sentence. And the district court ---- Just shows a bad understanding of statistics, right? It's life expectancy at birth is 67, but if you've made it to 59, you survive all sorts of things. It's improper no matter how he's considering it, Your Honor. And I would refer ---- And what page are you on? Your Honor, it's found at S.E.R. 69 to 70. The court concludes, the court is convinced that the sentence is appropriate. Indeed, it is, as the defense counsel argues, it is perhaps a life sentence for the defendant. Yeah. I'm on page 69 to 70. What line are you on? I'm trying to read along with you, and I'm having trouble finding this. I'm sorry, Your Honor. I'm on page 69. If you want me to be on page 70, tell me. I'm on page 79, line 10. Is that it? At 10, Your Honor. Okay. So he says the defense counsel argues it's perhaps a life sentence. In any event, he will be an elderly man. Well, he will be an elderly man whether he's Navajo or anything else. Correct, Your Honor. Why is he relying on the fact that he is Navajo when he says in any event he will be an elderly man? Because he said the line right at 11, indeed, it is, as the defense counsel argues, it is perhaps a life sentence for the defendant. And what defense counsel had argued specifically was that a Navajo male's life expectancy was 67 approximately years, and that this defendant would therefore be serving a life sentence. So you're taking that statement by the judge to incorporate all of the factors, including his status as a Navajo, as to why this is a potential life sentence. Okay. That specific argument, yes, Your Honor. But he also did – What do you do? This may be a more abstract question. What do you do if life expectancy is a relevant factor in whatever case it is, and if it turns out that someone who is actuarially doing a good job and is trying to predict life expectancy will tell me that the average life expectancy for a male of this race is Y, the average life expectancy for a male of that race is Z? I can't look at that number? You cannot, Your Honor, because it is specifically precluded by the guidelines, and Cook lays that out also. I read Cook. But that strikes me as perhaps an artificially constraining view of things when what we have is simply a fact. If this is the life expectancy, this is the life expectancy. Yes, Your Honor. However, if the Court's going to allow that, then for every single race or nationality that comes before a district court for sentencing, we have to allow – But your position leads me to the point where the judge is simply going to be unable to determine what the actual life expectancy is of the person in front of him. That's correct, Your Honor. It's because – Let's say he's got cancer, and – Well, that – Somebody with that kind of cancer has a life expectancy of five and a half years. But, Your Honor, that doesn't – Half the people live longer. But that goes to the illness, the health of the defendant. It does not go to race or national origin. You could be black, white, brown, yellow, and have cancer, and your life expectancy would be different, as opposed to a normal life expectancy. Life expectancy is determined on the basis of a number of facts, your state of health, your genes, you know, maybe whether, you know, you had long-living ancestors, and for better or for worse, race. We know that people of different races tend to have somewhat different life expectancies because race tends to subject people differentially to certain kinds of illnesses. I mean, it's an uncomfortable fact because none of us will think about death at all, but it's a reality. So if you're saying, look, we're putting this man away, and there's something about his history, be it race, be it illness or whatever, that says he's going to only live for six years and never give him a 10-year sentence, we know that he's never going to see the light of day. You can't calculate. You have to sort of close your eyes to it because part of that number is calculated based on his race. Well, see, there, Your Honor, you would have a difference, because if you are not considering solely a life expectancy based on race, which is the case in this. Cook and Anders say clearly that the district court may consider a complex of factors. So if the defendant has cancer, et cetera, et cetera, et cetera, that is something that the court can take into consideration. But the district court was not considering anything other than the fact that this was a Navajo male that was a certain age. It was not taking into consideration anything else when it said life expectancy. So there I must disagree with Your Honor, Judge Kaczynski's hypothetical. Your Honor, I see that I am just about out of time. Is there a specific? Yeah, I have one, and I don't think this is going to take as much over time. And that is we spent almost all of our time on the other way around. On the false allegation. Yes, Your Honor. On excluding the evidence that the complaining witness and victim had, at least according to the defendant's view, lied about when she charged that the Taylor brothers raped her. Yes, Your Honor. Now, if we're trying to figure out this case, a fair amount of this case rests upon the credibility of the complaining witness and victim. Absolutely. And why is it not relevant to her credibility in this trial that she might have lied on a prior occasion? Whether or not the government's theory she lied because it's part of her explanation to her boyfriend or infertility, or she's just a liar about sexual abuse, why is that not centrally relevant? That's to say, if you had evidence in your file of a prior lie by this complaining witness, who's your crucial witness on sexual matters and sexual abuse, and the very crime of sexual abuse, that even sounds like Brady Giglio material to me. Wouldn't you have to turn that material over? Absolutely, Your Honor, if it was clear evidence. But in this case, it was not clear. It was very speculative. The offer of proof was not clear. The proffer was weak. There was a lack of proof. You mean it's not speculative. The offer of proof was that she had told the sister that the brothers had raped her. Correct, Your Honor. And the sister was apparently prepared to testify to that. Correct, Your Honor. However, the victim denied making that statement, and there was no evidence that it had ever been reported, even if we assume that the proffer was true and the government's not conceding that. But there was no evidence that it had ever been reported to anyone else other than Julene Taylor, the sister. She retracts that statement by letter about a week later. So, Julene, according to the proffer, Julene would testify. But there was no letter, and, again, the victim did not. A letter retracting? There was no letter to admit, Your Honor. Defense counsel did not have the letter, just the testimony. So even if we ---- But the letter, I thought there was a letter that she apparently wrote retracting her charge. That one's in your favor, not in the defense counsel's favor. No, that was the proffer, Your Honor. I'm simply saying that it wasn't offered that we, in fact, have the letter to present into evidence. She testified that there was a letter. Correct, Your Honor. And under ---- So your basic answer is that the evidence of prior lie is not all that strong evidence. It might not have been a lie. She might not have said it. Correct, Your Honor. And also, under the analysis of Hughes v. Raines ---- But that's not a very good answer. I mean, that's always true of testimony. Much of the prosecution's case is composed of evidence that also might be a lie. And I don't quite get it. I mean, you get to put on your witness who might be lying for her own reasons. Why does that ---- Why does the fact that the defense wants to put on a witness who also might be lying for whatever reason make ---- Well, there are some very important reasons, Your Honor. First of all, because this did not bolster the theory of defense. The theory of defense was that ---- About whether somebody raped her. She did not ---- She did not claim that she was raped by the defendant. Consent is not an issue when you're talking about an 11-year-old child, Your Honor. This case involved sexual abuse of an 11-year-old child. The issue was collateral. There was no relevance to the charge. It's not whether or not this other crime that she charged, rape by the two brothers, is the same as the crime with which Mr. Saunders is charged. The argument is this young lady is a liar about sexual abuse to which she has been suspected, to which she has been allegedly subjected. So she lied about the Taylor brothers, and she's lying now. Your Honor, even if the Court assumes that that is the case, that she did lie about the Taylor brothers, that did not preclude the defendant from his argument that she lied. Of course it doesn't preclude his argument, but it sure takes away some evidence. But the court, the district court, Your Honor, found that that evidence was not ---- If it's no big deal, why did you keep it out? Why didn't you say, okay, we don't understand. Let's hear what she has to say. Julie's smart enough to be able to tell that she's lying. Why did you oppose it if it's no big deal? Because under this Court's analysis, in Hughes v. Rager, this should come in. You talk about the legal arguments as well. You're entitled to exclude. But why did you ---- It's irrelevant. So what? They want to exclude her. Why didn't you just say, go ahead. It's no big deal. The jury will decide she's a liar. We don't care. They'll convict anyway. I mean, obviously you must have thought that this was something that hurt your case. It was. Right? It would have hurt the case. Certainly, Your Honor. However, we do not ---- Of course it would have. And the way we've heard the case is it would have given the jury a reason to doubt whether when she talks about people taking advantage of her or having forced sexual relations. And when you're dealing with a small girl like that, it is forced, whether she's some sense willing or not. It is rape. That she knows how to fabricate and has done it in the past. So maybe she's fabricating this time. But, however, Your Honor, the proffer was that she recanted and said no. So even if that was to come in, that did not aid the defense. Well, that actually helps them even more because she lies and then takes it back. She is herself admitting that the statement she made earlier was untrue. If she had sort of left the allegation out there, it was never proven. Now, this proven, she could say, well, you know, I got raped by this guy, I got raped by these guys, too. But she actually confesses. She actually says, I lied about this. Pretty strong stuff. I can see why you wanted to keep it out. But you, Your Honor, are assuming that that was true and the government ---- I'm assuming nothing of the sort. What I'm assuming is that the jury could have believed it's true. That's what we have to assume here, that you put in evidence and that might be believed by the jury. I am sure on cross-examination you would have destroyed her and there would have been nothing left of that testimony. But maybe the jury would have believed her. Maybe, in fact, she would have pulled out the letter at the last minute. Right before she gets on the stand, she says, I searched my files, I found the letter of retraction. Maybe she would have come up with details that only she could have gotten only from the victim, from the alleged victim. That's what happens when people testify. As you know, in the courtroom, once they get on the stand, all sorts of things happen. Certainly, Your Honor. That are unexpected. And why wasn't the defendant entitled to that? Why wasn't he entitled to ---- Because Hughes v. Rain says we do not allow a inference. But Hughes is a habeas case. Yes, it is, Your Honor. However, that's ---- There's a great deal more deference to the decisions made by trial judges in state courts on habeas than we do in reviewing evidence decisions by district judges. But it was not error by the district court to preclude that information when it found that it was far the probative value was far outweighed by the prejudice that such information ---- I don't understand prejudice. I understand that he might not have thought it was very probative as to not being truth-telling. Yes, Your Honor. What do you mean by prejudice? The prejudice that it would have caused confusion to the jury. It might have been that the government's case might have gotten weaker because they wouldn't have believed the complaining witness victim. But this was not a weak case, Your Honor. The government often mistakes this rule, but it is not prejudice. It is unfair prejudice. Unfair, absolutely. So the fact that, gee, this is prejudicial because it's going to hurt my case is not at all something that the district court can take into account. It has to be prejudicial in an unfair way. Somehow the jury will mislead, or somehow this will create an inference, oh, the defendant usually thinks the defendant is a bad guy because he was carrying a gun. Unfair prejudice. What's unfair prejudice here? No, this would be unfair, Your Honor, because ---- To whom would it be unfair? It would be unfair to the government. And how would it be unfair to the government? Because the test ---- first of all, let me remind the court that the ---- Why don't you first of all tell us how it would be unfair to the government? Because the proffer was weak. It was ---- Yeah, but that goes on probably the value side. That goes on probably the value side. Now tell me the unfair prejudice. Because the jury might have improperly inferred that the ---- because this victim lied on a prior occasion, even though she may have recanted, that she lied this time when there was no ---- What's unfair about that? That's exactly what proffers are made of. That's fair prejudice. That's the very purpose of putting the witness on, is to weaken the credibility of the government's witness. That's not unfair prejudice. That would be different if somehow they ---- it was something about the testimony said, oh, and by the way, she is also a drug user. Or maybe saying, oh, they shouldn't believe her because of a race or, you know, something there that has nothing to do with it. But all this is saying is don't believe her because she lied once, she lied again. What's unfair about that? Because the court does not approve of such inferences, Your Honor. Which court is that?  No, Your Honor, because this was not a weak case. How about bringing in all those sexual episodes in between that the judge said you shouldn't bring in? The judge did not say we shouldn't bring in anything other than episodes which occurred outside of the time period of January to June of 1993. What was the relevance of those uncharged episodes? Why did they have to be presented? They did not have to be presented, Your Honor. And in fact, the government did not elicit any testimony about those incidents. It was only after cross-examination appeared to infer that the victim never mentioned more than one incident.  Yes, Your Honor. So what they said is you've testified there's three incidents. You mentioned one. You didn't mention a second and a third. Why didn't you mention a second and a third? There was nothing about the in-between incidents that would have justified the opening of the door or anything else, discussing them. You could have, on redirect, you could have gotten. The government didn't discuss them, Your Honor. The government only brought out the fact that the victim had reported more than three incidents. It did not elicit any details, any time periods, nothing. But that's the very point. Why did you have to bring out? How do you justify bringing out more than three incidents? That was allowed by the court's ruling, Your Honor. But we're reviewing that ruling. That's what we do, you know. This is why you're here. Yes, Your Honor. Why was the court right? Because those incidents were inextricably intertwined. How? Because it was a continuing event, a continuing scheme of events with between the same parties. It was one sexual episode? It started and lasted for weeks and months? It was repeated, Your Honor, for months. Yes, that is correct. Repeated doesn't mean necessarily inextricably intertwined. It's just that you're saying that this happened over and over again. You charged three of them. And I think it's entirely possible to understand the three charges without having the others brought in, so they're not inextricably intertwined in the sense of you simply can't understand the charge conduct on the three occasions. Of course, it does, in the jury's mind, make it more likely that it happened on the three occasions if it happened on ten more. But I don't understand the inextricably intertwined argument. I don't either. I'm sorry? I don't either. Your Honor, the – is the court clear that there was no testimony elicited on direct from the government on more than the three incidents? Yes, we do understand. It was only – Yeah, we understand perfectly well. We don't understand why you brought it out on redirect. Because the defense counsel sought to infer – to bring out an inference that this victim never reported more than one incident. And that is all that the government elicited. What does the other incidents, what does bringing out – how does that justify bringing out incidents which were not charged? It bolsters the government's case, and it showed the pattern of behavior, as you yourself had said, Your Honor. Showed the pattern of behavior. Is that a legitimate thing? In other words, you show that he is a molester by doing a bunch of acts, and therefore he must have acted in conformity with that proclivity? Is that what you're saying? Not exactly, Your Honor. Fair enough, because that's specifically prohibited by the legal evidence, right? No. He's saying – the government was saying that these acts were so inextricably intertwined that it needed to be able to bring those out to give a true picture to the jury. But it didn't bring them out other than to discuss – Okay. I still don't understand why, but I think you've explained as well as you're going to be able to. So thank you. Thank you, Your Honor. The government would ask that the judgment be affirmed, but the sentence vacated in this matter remanded for resentencing. Okay. Thank you. We'll give you a minute, if you wish to take it. I'll be very quick. A lot of subject matter was discussed. I just wanted to get back to, very quickly, the 404B issue, and I would encourage the Court to read Ms. Bileen's cross-examination by Mr. Glanzer. He was very careful to elicit testimony and contradictions within the context of the statements that were introduced on direct examination only. He did not refer to anything other than the three events that were the subjects of the indictment. And there's nothing about the inextricably intertwined exception that says when a defendant gets impeached, we're allowed to start introducing other act evidence. And that's all I would add. The case is argued. We'll stand some minutes. Finally, we'll hear argument in DeLorto v. Stark.
judges: Kozinski, W. Fletcher, Bybee